## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## AT FRANKFORT

_____

)
**FORESIGHT COAL SALES, LLC,** )
)  **Case No.**
  Plaintiff, )
v. )
)
**MICHAEL SCHMITT,** *in official capacity as* )
*Chairman and Commissioner of* )
*Kentucky Public Service Commission;* )  **COMPLAINT**
**ROBERT CICERO,** *in official Capacity as* )
*Commissioner of Kentucky Public Service* )
*Commission;* )
**TALINA MATHEWS,** *in official Capacity as* )
*Commissioner of Kentucky Public Service* )
*Commission;* )
**KENT CHANDLER,** *in official capacity as* )
*Executive Director of Kentucky Public* )
*Service Commission;* )
**DANIEL CAMERON,** *in* )
*official capacity as Kentucky Attorney* )
*General;* )
)
  Defendants. )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CHALLENGING CONSTITUTIONALITY OF STATE REGULATION

Plaintiff Foresight Coal Sales, LLC ("Foresight"), by and through its counsel, for its Complaint against Defendants, Michael Schmitt, Robert Cicero, Talina Mathews, Kent Chandler, and Daniel Cameron, in their official capacities, as displayed in case caption above (collectively, "Defendants"), states as follows:

## SUMMARY OF THE CASE

1.      Plaintiff files the instant Action because Kentucky adopted a regulation that is a blatant and unapologetic effort by the State to inhibit interstate commerce by neutralizing the cost-advantage inuring to coal producers in states that do not impose severance taxes, including the state of Illinois.

2.      The Commerce Clause vests sole authority for governing interstate commerce in the federal government.  Any state law that seeks to infringe upon the free flow of goods and services across state lines is *per se* unconstitutional.

3.      The regulation in question—807 Ky. Admin. Regs. 5:056(3)(5) (the "Regulation")—violates the Commerce Clause—specifically, what has become known as the "Dormant Commerce Clause."  This Action seeks a judgment from this Court declaring the offending legislation unconstitutional and enjoining Defendants from enforcing the offending Regulation.

4.      It is rare for public officials to declare their specific intent to promulgate an unlawful directive on the record.  Yet that is exactly what happened here.

5.      In on-the-record public proceedings, the Kentucky Public Service Commission (the "PSC") admitted that the Regulation is specifically intended as a protectionist measure to artificially enhance the competitiveness of Kentucky coal providers that bid on public utility contracts.  This admitted in-state favoritism disadvantages out-of-state coal providers, like Plaintiff, that operate in states that do not impose severance taxes and burdens interstate commerce in violation of the Dormant Commerce Clause.

6.     Defendants' unconstitutional conduct poses an immediate threat of irreparable harm to Plaintiff and must be enjoined immediately.

## INTRODUCTION

7.     Utilities regulated by the PSC are required by law to take reasonable steps to ensure that they source fuel and other raw materials in the most cost-effective manner while still providing affordable, reliable energy to the consumer.

8.     Coal is a critical fuel source both nationwide and in Kentucky, and it is sold in an increasingly competitive interstate market.

9.     This lawsuit challenges the constitutionality of a recently enacted Regulation that directs regulated utilities in Kentucky to ignore "severance taxes" when determining which coal supplier offers the best price.   Importantly, the Regulation does not absolve the Kentucky utility from *paying* the severance tax; instead, it only directs the utility to subtract the severance tax when calculating which bid represents the most affordable coal.

10.     This Regulation was passed with specific knowledge of the fact that, while Kentucky charges coal producers a 4.5% severance tax on coal mined within Kentucky, Illinois does not charge a severance tax for coal produced in Illinois.

11.     Thus, the Regulation's purpose is to neutralize the cost advantage of Illinois coal producers while simultaneously propping up their Kentucky counterparts.   For this reason, the Regulation violates the Commerce Clause embodied in the United States Constitution article I, section 8, clause 3—specifically, the Dormant Commerce Clause.

12.     Under the Dormant Commerce Clause, a state may not "enact laws imposing substantial burdens on [interstate and foreign] commerce." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010). "In this 'dormant' form, the Commerce Clause limits the power of the states to erect barriers against interstate trade." *Id.* (internal quotation marks and citation omitted).

13.     In short, pursuant to the Dormant Commerce Clause, a "protectionist law"—*i.e.*, one that "that favor[s] in-state economic interests at the expense of out-of-state interests"—"is per se invalid." *Id.* at 645. If the law is not protectionist, however, it will be struck down only if "the burden it imposes upon interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* (internal quotation marks and citations omitted).

14.     Here, the PSC—an administrative agency statutorily charged with enforcement and regulation of certain utility rates and services in the state—promulgated a clearly protectionist regulation in 807 Ky. Admin. Regs. 5:056(3)(5) (effective August 20, 2019), which reads as follows:

> For any contracts entered into on or after December 1, 2019, the commission shall, in determining the reasonableness of fuel costs in procurement contracts and fuel procurement practices, ***evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel less any coal severance tax imposed by any jurisdiction.***

*Id.* (emphasis added).

15.     Under this regime, for example, if a utility receives two bids, one from an Illinois producer with a price of $48.00 per ton and one from a Kentucky producer with a price of $50 per ton, the Regulation directs the utility to deduct 4.5% of the Kentucky coal producer's bid. So, in this example, the Kentucky coal would

artificially appear to cost the utility $47.75 per ton ($0.25 *less* than the Illinois coal) even though the utility will still pay the full $50.00 per ton ($2.00 *more*) to the Kentucky producer.

16.    Exercising the broad authority conferred by Kentucky statute to determine "fair, just, and reasonable" rates, the PSC now requires utilities to evaluate fuel costs only after deducting the severance tax imposed on Kentucky coal producers, and ostensibly producers from any other states that impose such taxes. This modified "reasonableness" assessment directly benefits in-state interests. At the same time, it imposes a concomitant burden on out-of-state coal producers operating in states without severance taxes, like Illinois, because—despite whatever other taxes they may include in their bids—there is no severance tax to deduct from the quoted price.

17.    As such, the Regulation is effectively a price credit conferred on Kentucky coal companies that bid on PSC-regulated utilities through its modified "reasonableness" calculus. And, in this respect, it is repugnant to the Commerce Clause of the United States Constitution. *See, e.g., All. for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995), *affirming All. for Clean Coal v. Craig*, 840 F. Supp. 554 (N.D. Ill. 1993) ("A state [regulation] may violate the commerce clause *either* by discriminating against out-of-state economic interests *or* by benefiting in-state interests.") (emphasis added) (citing United States Supreme Court cases).

18.    The PSC openly concedes the discriminatory purpose alleged, as shown by a 2019 hearing in which a Commissioner of the PSC explains that the Regulation's

"bottom line" purpose was to "**incentivize Kentucky utilities to purchase Kentucky coal**," or to "**remove a disincentive**" borne of Kentucky's coal severance tax, which would excuse a "higher price" from the PSC-imposed "reasonableness" calculation "under the circumstances." *See* https://www.youtube.com/watch?v=GwAa4b3Qims&feature=youtu.be (last accessed Mar. 13, 2020) (Time Stamp: 9:53 AM – 9:54 AM).

19.    The Kentucky Coal Association's Executive Director, Tyler White, who fervently supported the Regulation, stated as follows: "Only 40 percent of Kentucky's coal burned is actually coal from Kentucky. . . . That's because it can be mined in other places cheaper, and a part of that is . . . they don't have a severance tax." KET, Energy in Kentucky, https://www.ket.org/program/kentucky-tonight/energy-in-kentucky-34351/ (Time Stamp: 43:10–43:21).

20.    The PSC's blatant protectionism was fully displayed in draft versions of the Regulation, which facially favored Kentucky coal producers by directing utilities to "evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel *less any tax collected under KRS 143.020*." (emphasis added). *See* Exhibit A (a copy of the draft).  Although the promulgated version of the regulation attempted to mask its protectionist purpose by removing the draft version's express reference to the Kentucky severance tax, the current Regulation's intent *and* effect remains the same: improperly advantaging Kentucky coal producers to the detriment of competitors in directly competing states, like Illinois and Indiana, with no coal severance tax.

6

*See* https://www.youtube.com/watch?v=GwAa4b3Qims&feature=youtu.be (last accessed Mar. 13, 2020) (Time Stamp: 9:53 AM – 9:54 AM).

21.     Because of the Regulation, a utility company may now be required to choose a Kentucky coal producer's matched or even more expensive bid simply because of the coal producer's location.

22.     Plaintiff—an Illinois coal producer competing directly with Kentucky coal producers on bids subject to PSC jurisdiction—has been unconstitutionally discriminated against and competitively disadvantaged by the Regulation's mandate. *Cf. All. for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) (in action by coal association against coal commissioners in state agency: affirming district court opinion that had, *e.g.*, declared as unconstitutional state law in violation of Dormant Commerce Clause, and enjoined enforcement).

23.     A federal court may enjoin a state officer from taking future actions that violate federal law or to take prospective actions to comply with Constitutional mandates. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also All. for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995), *affirming All. for Clean Coal v. Craig*, 840 F. Supp. 554 (N.D. Ill. 1993) (Commissioners of Illinois Commerce Commission successfully sued in official capacities by non-profit coal association for discriminating in favor of state coal industry in violation of Dormant Commerce Clause).   The "Ex Parte Young" doctrine empowers federal courts to enjoin state officials to conform their future conduct to the requirement of federal law, including

the United States Constitution.  *Jones v. Perry*, 215 F. Supp. 3d 563, 568 n.3 (E.D. Ky. 2016).

24.     This action seeks urgent declaratory and injunctive relief for injuries caused by the Regulation.

## PARTIES

25.     Plaintiff Foresight Coal Sales, LLC ("Foresight") is an Illinois coal producer. Foresight is an LLC, formed under Delaware law, with a principal place of business in Illinois.

26.     Foresight directly competes with coal producers in Kentucky on bids to utility companies subject to the jurisdiction of the Kentucky Public Service Commission, and thus its regulations and enforcement thereof, including 807 Ky. Admin. Regs. 5:056.

27.     Defendant Michael Schmitt is sued in his official capacity as Chairman and Commissioner of the Kentucky Public Service Commission, located in Frankfort, Kentucky.  He is charged as "chief executive officer" of the Commission under Ky. Rev. Stat. § 278.050(2).   He has state executive authority, including the administration and enforcement of Chapter 278 of the Kentucky statute, through his role in the Kentucky Public Service Commission, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056.

28.     Defendant Robert Cicero is sued in his official capacity as Commissioner of the Kentucky Public Service Commission (and Vice Chairman), located in Frankfort, Kentucky.  He is charged with state executive authority, including the

administration and enforcement of Chapter 278 of the Kentucky statute, through his role in the Kentucky Public Service Commission, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056.

29.     Defendant Talina Mathews is sued in her official capacity as Commissioner of the Kentucky Public Service Commission, located in Frankfort, Kentucky.   She is charged with state executive authority, including the administration and enforcement of Chapter 278 of the Kentucky statute, through her role in the Kentucky Public Service Commission, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056.

30.     Defendant Kent Chandler is sued in his official capacity as Executive Director of the Kentucky Public Service Commission, located in Frankfort, Kentucky. He is charged as "chief administrative officer" of the Commission and responsible for, among other things, implementing the programs and directing the staff under Ky. Rev. Stat. § 278.100.  He has state executive authority, including the administration and enforcement of Chapter 278 of the Kentucky statute, through his role in the Kentucky Public Service Commission, including its promulgation and enforcement of 807 Ky. Admin. Regs. 5:056.

31.     Defendant Daniel Cameron is sued in his official capacity as Attorney General of Kentucky.  In this role, he is the chief law enforcement officer of the Commonwealth of Kentucky and all of its departments, commissions, agencies, and political subdivisions, and principal legal adviser to all state officers, departments,

commissions, and agencies, including the Kentucky Public Service Commission, and the administration and enforcement of laws thereof.

32.    The Kentucky Public Service Commission is an administrative agency of the Kentucky state government tasked with the statutory responsibility of regulating utilities and enforcing the provisions of KRS Chapter 278.  Specifically, the PSC is charged with the "regulation of rates and service of utilities," and is given broad authority to determine whether rates are "fair, just, and reasonable." Ky. Rev. Stat. § 278.040; Ky. Rev. Stat. § 278.2207.  It is located at 211 Sower Boulevard, Frankfort, Kentucky 40602-0615.  The PSC is "a body corporate, with power to sue and be sued in its corporate name."  Ky. Rev. Stat. § 278.040.

### JURISDICTION AND VENUE

33.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 2201–02, and 1343.

34.    This Court has personal jurisdiction over the parties because the Kentucky Public Service Commission is located in the Eastern District of Kentucky and the relevant acts occurred in the Eastern District of Kentucky.

35.    Venue is proper in this district pursuant to 28 U.S.C. § 1391.

### NOTICE OF CLAIM PROVIDED TO DEFENDANTS

36.    On November 29, 2019, counsel for Plaintiff sent a notice letter, via certified mail, to Defendants alerting them to the unconstitutionality of the Regulation.

37.    A copy of the letter and the certified mail receipts are attached hereto as Exhibit B.

38.    On January 8, 2020, the PSC responded by letter, stating that it had requested an opinion regarding the Regulation's constitutionality from the Attorney General of the Commonwealth of Kentucky.  It also noted that it would suspend enforcement of the Regulation until the Attorney General opined on the Regulation's constitutionality.  A copy of that letter is attached hereto as Exhibit C.

39.    On March 4, 2020, the Attorney General issued an opinion that the Regulation did not violate the Dormant Commerce Clause because, in the Attorney General's opinion, it did not favor Kentucky coal producers over all out-of-state producers.  A copy of that opinion is attached hereto as Exhibit D.

40.    Specifically, the Attorney General found that "[a]n adjustment to offset coal severance taxes would cause Kentucky coal to be priced more competitively in comparison to some states and less competitively with respect to other states, depending on which states have chosen to enact severance taxes and at what rate." The Attorney General noted that, given Kentucky's 4.5% severance tax, the Regulation "might arguably benefit coal producers in Kentucky relative to those in Indiana and Illinois," neither of which has a severance tax.  But, he reasoned, "the same logic would mean that [the Regulation] could hurt Kentucky coal producers relative to those [unidentified] states where the severance tax may be higher."  And, he concluded, "nothing prevents states from altering their severance tax if they believe it will provide their coal producers with a competitive advantage in Kentucky."  On this basis, the Attorney General concluded "there is no merit to the

argument that discounting severance taxes . . . will favor Kentucky coal producers to the detriment of *all* out-of-state interests" (emphasis added).

41.     The Attorney General noted that it offered its opinion "without a factual record to consider," and it did not consider the blatant protectionist rationale that proponents of the Regulation offered prior to its promulgation.

42.     The same day the Attorney General released its opinion, the PSC sent a letter to Plaintiff stating that, based on the Attorney General's opinion, it would no longer suspend enforcement of the Regulation.

### BACKGROUND

43.     The PSC is a state administrative agency tasked with the statutory responsibility of regulating utilities and enforcing the provisions of KRS Chapter 278. Specifically, the PSC is charged with the "regulation of rates and service of [certain] utilities." *See* Ky. Rev. Stat. § 278.040.

44.     The PSC, which is comprised of three Commissioners, has quasi-legislative and quasi-judicial duties and powers regulating more than 1,100 utilities. It "performs its regulatory functions through issuance of written orders, following adjudicative and rulemaking procedures outlined in Chapter 278 and administrative regulations promulgated by the Commission in Chapter 807 of the Kentucky Administrative Regulations."[1]   Its "reasonable" regulations "implement the provisions of KRS Chapter 278 and investigate the methods and practices of utilities

---

[1] Official Website of the Commonwealth of Kentucky,
https://psc.ky.gov/Home/About#AbtComm (last accessed Mar. 11, 2020); *see* Ky. Rev. Stat. §§ 278.040(3), 278.050.

to require them to conform to the laws of this state, and to all reasonable rules, regulations and orders of the commission not contrary to law." Ky. Rev. Stat. § 278.040(3).

45.     By Kentucky statute, the PSC is given broad authority to ensure "rates, classifications and service of utilities" are "just and reasonable." Ky. Rev. Stat. § KRS 278.030.  "Because utilities are allowed to charge consumers only 'fair, just, and reasonable rates' under KRS 278.030(1), the [Commission] must ensure that utility rates are fair, just, and reasonable to discharge its duty under KRS 278.040 to ensure that utilities comply with state law." *Kentucky Pub. Serv. Comm'n v. Com. ex rel. Conway*, 324 S.W.3d 373, 377 (Ky.2010).[2]

46.     "Although KRS Chapter 278 grants the Commission sweeping authority to regulate public utilities, the [PSC] is a creature of statute and its powers are purely statutory, having only such powers as conferred expressly, by necessity, or by fair implication." *Kentucky Indus. Util. Customers, Inc. v. Kentucky Pub. Serv. Comm'n*, 504 S.W.3d 695, 704–05 (Ky. Ct. App. 2016).

47.     Effective August 20, 2019, the PSC amended 807 Ky. Admin. Regs. 5:056's "Fuel Adjustment Clause," which sets forth the requirements with which a utility company must comply when entering into—or evaluating whether to enter into—a contract with a coal producer.

---

[2] *See also* Kentucky Public Service Commission, Fuel Adjustment Clause: FAQs, https://psc.ky.gov/agencies/psc/consumer/FAC%20QandA.pdf (last accessed Mar. 11, 2020).

48.    A "fuel adjustment clause" ("FAC") is generally a mechanism that permits utilities to adjust the price of electricity regularly to reflect fluctuations in the cost of fuel, or purchased power, used to supply that electricity.[3]

49.    Fuel costs make up a significant portion of the cost of generating electricity.  Fuel prices, including the price of coal (used to generate 95% of Kentucky's electricity) can fluctuate widely over relatively short periods, as can the price of purchased power.  The FAC allows utilities to reflect those fluctuations in their electric rates without having to request changes in their base rates.[4]

50.    The FAC is set against a baseline fuel cost that is incorporated within the consumption-based (per kilowatt-hour) portion of a utility's base rates.  The FAC changes to reflect the fuel costs incurred in earlier months.

51.    "Fuel charges that are unreasonable shall be disallowed and may result in the suspension of the fuel adjustment clause based on the severity of the utility's unreasonable fuel charges and any history of unreasonable fuel charges."  807 Ky. Admin. Regs. 5:056(3)(1).

52.    "The [PSC] on its own motion may investigate any aspect of fuel purchasing activities covered by this administrative regulation."  807 Ky. Admin. Regs. 5:056(3)(2).

53.    Every six months, the PSC conducts "a formal review and may conduct public hearings on a utility's past fuel adjustments," and the PSC "shall order a utility

---

[3] Kentucky Public Service Commission, Fuel Adjustment Clause: FAQs, https://psc.ky.gov/agencies/psc/consumer/FAC%20QandA.pdf (last accessed Mar. 11, 2020).

[4] *Id.*

to charge off and amortize, by means of a temporary decrease of rates, any adjustments the commission finds unjustified due to improper calculation or application of the charge or improper fuel procurement practices." 807 Ky. Admin. Regs. 5:056(3)(3).

54.   A final review occurs at two-year intervals and results in a "disallow[ance]" of "improper expenses," and if needed "reestablish[es] the fuel clause charge in accordance" with the PSC's regulation. 807 Ky. Admin. Regs. 5:056(3)(4).

55.   Utilities are required to fully document all of their fuel costs. This requirement includes submitting fuel purchase contracts and other materials to the PSC. The PSC may, on the basis of that information, determine whether a utility has done everything it reasonably can do to keep fuel costs as low as possible, while maintaining a reliable fuel supply—as defined and determined by the PSC pursuant to 807 Ky. Admin. Regs. 5:056. The PSC declares nonconforming FAC's "not in the public interest" and may result in rate schedule suspensions.

56.   The PSC's recent Regulation, 807 Ky. Admin. Regs. 5:056(3)(5), interposes a definition of "reasonableness of fuel costs" that was intended to, and has the effect of, discriminating against certain out-of-state coal producers—namely, those operating in states, like Indiana or Illinois, where no severance tax is imposed and those operating in states, like West Virginia or New Mexico, that impose severance taxes lower than the one imposed by Kentucky—in favor Kentucky coal producers. The Regulation provides that:

> For any contracts entered into on or after December 1, 2019, the commission shall, in determining the reasonableness of fuel costs in

15

procurement contracts and fuel procurement practices, evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel less any coal severance tax imposed by any jurisdiction.

807 Ky. Admin. Regs. 5:056(3)(5).

57.     During an April 16, 2019 hearing before the PSC, the Chairman and Commissioner of the PSC expressly admitted that, the "**bottom line is the purpose** of at least the portion of the regulation that deals with the Kentucky coal severance tax," later adopted at 807 Ky. Admin. Regs. 5:056(3)(5), is to "**incentivize Kentucky utilities to purchase Kentucky coal**," or to "**remove a disincentive**" for Kentucky's coal severance tax, which would excuse a "higher price" from the PSC-imposed "reasonableness" calculation for Kentucky coal "under the circumstances." *See* https://www.youtube.com/watch?v=GwAa4b3Qims&feature=youtu.be (last accessed Mar. 13, 2020) (Time Stamp: 9:53 AM – 9:54 AM).

58.     During the Regulation's notice-and-comment period, the Regulation's protectionist intent was apparent on the face of the draft Regulation, which, at the time, mandated that utilities "evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel *less any tax collected under KRS 143.020.*" *See* Exhibit A.  Although the adopted version of the Regulation does not explicitly reference the Kentucky severance tax provision, its discriminatory intent and effect  remained the same.

59.     The Regulation impinges on Plaintiff's rights to compete on an equal footing in interstate commerce.  This injury is particular to those, like Plaintiff, who attempt to sell coal to Kentucky utilities subject to PSC jurisdiction.

16

60. Moreover: "While the [PSC] has considerable discretion in fulfilling its statutory duty to [e]nsure that rates are fair, just and reasonable, its power is not unlimited." *Kentucky Indus. Util. Customers, Inc. v. Kentucky Pub. Serv. Comm'n*, 504 S.W.3d 695, 705–06 (Ky. Ct. App. 2016). The Regulation appears to violate the PSC's own statutory charge to promulgate "*reasonable* regulations" and enforce "*reasonable* rules, regulation and orders of the commission *not contrary to law*" under Kentucky Revised Statute § 278.040. It also appears to cause utilities within in jurisdiction to violate Kentucky Statute § 278.170's prohibition against "discrimination as to rates or service," banning "unreasonable preference or advantage" of rates or services, including based on locality.

### THE DORMANT COMMERCE CLAUSE

61. The Framers "intended the Commerce Clause as a way to preserve economic union and to suppress interstate rivalry." Because the Commerce Clause "was intended to benefit those who are engaged in interstate commerce," its protections extend to burdens on interstate commerce. *River Oaks Mgmt., LLC v. Brown*, No. CIV.A.3:06CV00451-S, 2007 WL 2571909, at *3 (W.D. Ky. Sept. 4, 2007).

62. In its "dormant" form, the Commerce Clause limits the power of states "to erect barriers against interstate trade." *Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35 (1980).

63. The Dormant Commerce Clause's "core concern" is protectionism—"that is, differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Boggs*, 622 F.3d at 644–45. "Protectionist laws

are generally struck down without further inquiry, because absent an extraordinary showing the burden they impose on interstate commerce will always outweigh their local benefits." *Id.* at 645 (citation omitted).

64.     A "protectionist" state regulation "can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *E. Ky. Res. v. Fiscal Court of Magoffin County,* 127 F.3d 532, 540 (6th Cir.1997).

65.     A law discriminates "facially" based on the language of the regulation or statute itself; its discriminates "purposefully" based on statements of legislative intent or other outside sources where intent can be discerned, including legislative or regulatory history; and it discriminates "in practical effect" depending on whether and to what extent it favors local economic actors and burdens out-of-state actors. *See, e.g.*, *Boggs*, 622 F.3d at 644–50 (6th Cir. 2010) (citing cases); *River Oaks Mgmt., LLC v. Brown*, No. CIV.A.3:06CV00451-S, 2007 WL 2571909, at *4–6 (W.D. Ky. Sept. 4, 2007) (noting, with respect to "purposeful" discrimination, that, "where other sources, other than the state's own self-serving statement of its legislative intent, indicate the presence of actual and discriminatory purposes, a state's discriminatory purpose can be ascertained from [those] sources.").

66.     "If a statute discriminates against interstate commerce either on its face or in its practical effect, it is subject to the strictest scrutiny . . . [.] Where simple economic protectionism is effected by state legislation/regulation, a virtual *per se* rule of invalidity has been erected." *All. for Clean Coal v. Miller*, 44 F.3d 591, 595 (7th

Cir. 1995) (internal quotation marks and citations omitted). The "[p]reservation of local industry by protecting it from the rigors of interstate competition is the hallmark of economic protection that the Commerce Clause prohibits." *Id.* at 596; *see also All. for Clean Coal v. Craig*, 840 F. Supp. 554, 562 (N.D. Ill. 1993), *aff'd sub nom. All. for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) (holding that, to avoid invalidation pursuant to the Commerce Clause, Defendant would need to show no other reasonable means of advancing a "legitimate local purpose," and further holding that protecting a state's local industry and economy "is not a legitimate local purpose").

67.     If the Court determines that the law is not protectionist, it analyzes the law under the more deferential *Pike* balancing test, under which a law is invalidated only if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

68.     Here, the Regulation is "protectionist" under three analyses—facial, purposeful, and practical-effects. Thus, it is invalid under the Commerce Clause.

69.     *First*, the Regulation's language directly discriminates against interstate commerce by artificially altering the bid prices to exclude "any coal severance tax imposed by any jurisdiction." The language operates to favor those coal producers that operate in the highest severance-tax states (*e.g.*, those located in Kentucky). And it does so to the detriment of those operating in low- or no-severance-tax states (*e.g.*, Plaintiff). The language can have no other effect or meaning. Thus, the Regulation is invalid.

70.     *Second*, the regulatory history and PSC's own statements demonstrate discriminatory intent.  When the PSC amended the Regulation, it knew Kentucky coal producers' direct competitors in Illinois and Indiana had no coal severance tax to subtract from the cost of the fuel calculation when a utility was implementing the PSC's "reasonableness of the costs" evaluation with respect to coal producer bids.  *Cf. All. for Clean Coal v. Craig*, 840 F. Supp. 554, 561–62 (N.D. Ill. 1993), *aff'd sub nom. All. for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) ("In defining cost, the state considers the potential effects to the Illinois economy.  Although the state presents its justification in the guise of preservationism and environmental efficiency, its position amounts to naked protectionism."); https://www.youtube.com/watch?v=GwAa4b3Qims&feature=youtu.be                (last accessed Mar. 13, 2020) (Time Stamp: 9:53 AM – 9:54 AM) (PSC concessions about underlying purpose for amendment at issue and knowledge of other states' coal producer bids and impact).  In short, the Regulation was promulgated specifically to protect Kentucky coal producers and local economic interests by artificially altering their price competitiveness.  Once again, this fact renders the Regulation invalid.

71.     *Third*, and not surprisingly, the Regulation directly discriminates against interstate commerce "in practical effect."  Although the blatantly discriminatory purpose was masked by replacing the express reference to Kentucky's tax law with the phrase "any coal severance tax imposed," the law's operation—for Commerce Clause purposes—is largely unaffected.  The law continues to favor those

operating in the highest severance-tax states to the detriment of those operating in low- or no-severance-tax states. Once again, this fact renders the law invalid.

72. The Regulation effectively removes the ability of utilities subject to PSC jurisdiction to evaluate a coal producer's bid based on the competitiveness of the price. Instead, the PSC puts its thumb on the scale by requiring regulated utilities to pretend that coal from Kentucky producers costs 4.75% less than the price they will ultimately pay.

73. As applied to out-of-state coal producers from Illinois, like Plaintiff, the Regulation has the same effect as a "tax," "surcharge," "tariff" or "customs duty"—neutralizing the advantage possessed by lower cost out-of-state producers and elevating in-state producers by artificially repositioning them to win utility bids that are priced the same, and in some cases priced higher, than out-of-state producers selling coal to utilities subject to PSC jurisdiction.

74. That the Regulation may not favor Kentucky over "all out-of-state interests," as the Attorney concluded, is irrelevant. The Attorney General admits—as he must—that the Regulation artificially alters the landscape of interstate competition by favoring producers in high-severance-tax jurisdictions and by penalizing those in low- or no-severance-tax jurisdictions. In short, Kentucky claims the ability to pick winners and losers in interstate commerce by promulgating a Regulation that favors its preferred entities and disadvantages all others. The Commerce Clause prevents this discriminatory treatment.

21

75.     Even if the Regulation were somehow not protectionist and directly discriminatory in "purpose" and in "practical effect," the burden the PSC has imposed on interstate commerce is clearly excessive in relation to the putative local benefits, as described herein.  In particular, it prevents out-of-state coal producers with lower bids from winning contracts with in-state utilities to the extent the bid differential is exceeded by the amount of applicable severance tax.  But it does not alter the amount of money the utilities actually pay under those contracts.  Indeed, in many instances, the Regulation will require the utilities to pay a *higher* price than they can obtain on the open interstate market.  It will simply require them to pay that higher price to in-state coal producers (and perhaps others operating in states with similarly high severance taxes, to the extent such states exist).

## CAUSES OF ACTION

76.     Plaintiff realleges and incorporates by reference all allegations in the paragraphs above.

## COUNT I
## Injunctive Relief

### Preliminary Injunction

77.     Plaintiff is an Illinois coal producer directly competing with bids from Kentucky coal producers subject to PSC jurisdiction, and thus has been unconstitutionally discriminated against and competitively disadvantaged by the Regulation's mandate.

78.     The Regulation impinges Plaintiff's right to compete on an equal footing in interstate commerce.  This injury is particular to those, like Plaintiff, who attempt

to sell coal to Kentucky utility companies subject to PSC jurisdiction, causing them competitive injury.

79.   Plaintiff has a strong likelihood of success on the merits of its challenge to the Regulation because it is a "protectionist" state regulation that results in differential treatment of in-state and out-of-state economic interests, benefiting the former and burdening the latter.

80.   The Regulation discriminates "facially" based on its language; "purposefully," as demonstrated by its regulatory history; and in "practical effect" because it unconstitutionally benefits in-state coal producers and disadvantages out-of-state producers like those from Illinois who, as the PSC knew, have no coal severance tax to deduct from the PSC's "reasonableness of costs" mandate.

81.   Put simply, the Regulation encourages the purchase of Kentucky coal by allowing Kentucky coal producers to capitalize on Kentucky's tax structure and discourages the purchase of coal produced by those operating in states like Illinois who lack that precise tax structure.

82.    The PSC did not promulgate the Regulation to advance a legitimate local purpose; instead, it promulgated the Regulation to protect in-state economic interests to the detriment of out-of-state businesses.    Even assuming— counterfactually—that a legitimate local purpose existed, the Regulation was neither a reasonable means nor the only reasonable means to advance it.

83.   Plaintiff also has a strong likelihood success on the merits of its challenge to the Regulation, even if the regulation were not "protectionist" and

directly discriminatory, because the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.

84.     When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor.  *See, e.g.*, *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). This is a question of law for the Court.

85.     Plaintiff will also suffer irreparable injury if a preliminary injunction does not issue.  Loss of a constitutionally guaranteed freedom constitutes irreparable injury.  *See, e.g.*, *id.* (noting that the loss of a constitutionally protected right "unquestionably constitutes irreparable injury").

86.     Beyond the harm to Plaintiff's constitutional interests, Plaintiff is suffering and will continue to suffer a competitive disadvantage when bidding for projects under the PSC's jurisdiction.  For example, on March 5, 2020, Plaintiff was forced to adjust its bid on a project submitted to Louisville Gas and Utility to account for the 4.5% severance tax amount that will be disregarded in Kentucky coal providers' bids.  Similarly, Plaintiff will have to adjust an upcoming March 20, 2020, bid on a project for the East Kentucky Power Cooperative to account for the 4.5% amount that will be disregarded in Kentucky coal providers' bids.  Absent an injunction, Plaintiff will continue to suffer an irreparable competitive disadvantage as a result of the PSC's protectionist regulation. *See* Exhibit E, Affidavit of R. Todd Adkins Demonstrating Irreparable Injury.

87.     Issuance of the preliminary injunction will not cause substantial harm to others.  No substantial harm can be said to inhere in the enjoinment of a law where, as here, there is a likelihood of success of a constitutional claim.

88.     The public interest would be served by issuance of the preliminary injunction because it is always in the public interest to prevent the violation of a party's constitutional rights.  It is in the public interest not to perpetuate the unconstitutional application of a state regulation and to prevent the unlawful competitive injury caused.

89.     This Court has discretion to waive any security requirements under Federal Rule of Civil Procedure 65(c).  No bond is required here.  A preliminary injunction would merely require compliance with the Constitution, Plaintiff has a high likelihood of success, and Defendants do not stand to suffer economic losses should they be enjoined from enforcing the Regulation and required to comply with the Constitution.  *See, e.g.*, *Doe v. Pittsylvania Cty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012); *accord Campos v. I.N.S.*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998). "There is no reason to require a bond in" a case such as this. *Hope v. Comm'r of Indiana Dep't of Correction*, No. 116CV02865RLYTAB, 2017 WL 1301569, at *8–9 (S.D. Ind. Apr. 6, 2017) (citing *Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010)).

90.     A motion for preliminary injunction is contemporaneously filed with this Complaint.

## Permanent Injunction

91.     Plaintiff realleges and incorporates by reference all allegations in the paragraphs above.

92.     The Regulation violates the Commerce Clause of the United States Constitution—specifically, the Dormant Commerce Clause.

93.     If a constitutional right is being threatened or impaired, irreparable injury exists as a matter of law.

94.     Plaintiff has suffered an irreparable injury through the constitutional violation and competitive injury described herein—and will continue to suffer irreparable injury unless a permanent injunction is issued.

95.     Other remedies available at law, such as monetary damages, are inadequate to compensate for the injury, which includes the violation of Plaintiff's constitutional rights and the undermining of Plaintiff's ability to bid competitively against Kentucky coal producers' bids for projects subject to PSC jurisdiction.

96.     Issuance of the permanent injunction would not cause substantial harm to others.  No substantial harm exists in the enjoinment of a law where the constitutional violation alleged is found to have occurred.

97.     Balancing the hardships between the parties, the requested remedy in equity is warranted.

98.     The public interest is served by issuance of the permanent injunction to prevent the continued violation of a constitutionally guaranteed right and the competitive injury to Plaintiff.

99.     Accordingly, a permanent injunction should be issued here.

## Count II
## Declaratory Relief

100.    Plaintiff realleges and incorporates by reference all allegations in the paragraphs above.

101.    Under the facts alleged herein, an actual, justiciable, and substantial controversy exists between Plaintiff and Defendants, who are adverse in legal interests.

102.    Plaintiff is an Illinois coal producer directly competing with bids from Kentucky coal producers subject to PSC jurisdiction, and thus has been unconstitutionally discriminated against and competitively disadvantaged by the Regulation's mandate.

103.    The Regulation impinges Plaintiff's right to compete on an equal footing in interstate commerce. This injury is particular to those, like Plaintiff, who attempt to sell coal to Kentucky utilities subject to PSC jurisdiction, causing it competitive injury.

104.    Plaintiff seeks declaratory relief based on the specific and live grievance alleged, causing deprivation of a constitutionally guaranteed right and the competitive injury alleged arising from the PSC promulgation of 807 Ky. Admin. Regs. 5:056(3)(5).

105.    The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

106. Plaintiff requests that the Court declare 807 Ky. Admin. Regs. 5:056(3)(5) invalid and unenforceable because it violates the Commerce Clause of the United States Constitution. *See* Fed. R. Civ. P. 57; 28 U.S.C. §§ 2201, 2202.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff Foresight Coal Sales, LLC, respectfully requests that the Court enter judgment in its favor and against Defendants in their official capacities, as follows:

1. Set a prompt hearing on Plaintiff's request for preliminary injunction;

2. Declare that 807 Ky. Admin. Regs. 5:056(3)(5) is invalid and unenforceable because it violates the Commerce Clause of the United States Constitution;

3. Issue an Order preliminarily and permanently enjoining Defendants from enforcement of 807 Ky. Admin. Regs. 5:056(3)(5), and ordering the PSC's compliance with the United States Constitution;

4. Award Plaintiff all costs and fees incurred in bringing this action to the extent permitted under applicable laws; and

5. Award all other relief as deemed just and proper.

DATED: March 17, 2020

Respectfully submitted,

/s/Robert M. Sellards
Robert M. Sellards, Esquire (KY Bar # 92394)
BAILES CRAIG YON & SELLARDS, PLLC
401 10th Street, Suite 500
Huntington, WV 25701
Tel. (304) 697-4700
Fax. (304) 697-4714
rms@bcyon.com


/s/Nicholas S. Johnson
Nicholas S. Johnson (WVSB # 10272)[5]
Bailey & Glasser LLP
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101
***Motion for Pro Hac Vice Admittance
Forthcoming***

---

[5] The Plaintiff filed a voluntary bankruptcy case in the Eastern District of Missouri on March 10, 2020.  The Plaintiff and its affiliated debtor entities have filed a motion for a bankruptcy court order approving the firm's employment.  As of the date hereof, that motion remains pending.