UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| FORESIGHT COAL SALES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:20-cv-00021-GFVT |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MICHAEL SCHMITT, in his Official | ) | **&** |
| Capacity as Chairman and Commissioner of | ) | **ORDER** |
| Kentucky Public Service Commission, *et al.*, | ) | |
| | | |
| Defendants. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Foresight Coal Sales, LLC has moved the Court for a preliminary injunction to enjoin the application of a regulation passed by Kentucky's Public Service Commission. Foresight Coal argues that the recently enacted regulation violates the dormant Commerce Clause because it discriminates against coal producers who operate outside of Kentucky, and whose states of operation do not impose a coal severance tax. For the following reasons, Foresight's Motion for Preliminary Injunction [R. 4] is DENIED.

**I**

Plaintiff Foresight Coal Sales, LLC is an Illinois-based coal producer. [R. 1 at ¶ 25.] Foresight initiated this suit on March 17, 2020 against members of the Kentucky Public Service Commission in their official capacities and Attorney General Daniel Cameron.[1] *Id.* Kentucky's Public Service Commission (PSC) is an administrative agency responsible for "regulating

---

[1] Attorney General Daniel Cameron is named as a defendant in his official capacity because he is "principal legal adviser to all state officers, departments, commissions, and agencies, including the Kentucky Public Service Commission[.]" [R. 1 at ¶ 31.]

utilities and enforcing provisions of KRS Chapter 278." *Id.* at ¶ 32. Because the price of fuel tends to fluctuate, utility companies are empowered to adjust the rates they charge their customers "above or below the utility's base rate." [R. 21 at 2.] This is known as the "fuel adjustment clause." *Id.* Broadly speaking, the PSC monitors rate adjustments made under the fuel adjustment clause and services of utilities by utility companies to ensure rates are "fair, just, and reasonable." K.R.S. § 278.040; K.R.S. § 278.2207.

To enable review, utility companies "provide the PSC extensive documentation about fuel procurement," and "[e]very six months, the PSC conducts a formal review of the utility's fuel charges." [R. 21 at 2.] At six-month reviews, "the PSC can order the utility to 'charge off and amortize' an unjustified rate through a temporary decrease of the rate charged to its customers." *Id.* Every two years, the PSC conducts a "final review of the utility's fuel adjustment" wherein the PSC evaluates "past operations of the [fuel adjustment] clause, disallow[es] improper expenses and, to the extent appropriate, reestablish[es] the fuel clause charge." *Id.* (citations omitted). Defendants explain that "the six-month and two-year reviews allow the PSC to determine whether a utility has acted reasonably in purchasing fuel and passing through its additional costs to consumers." *Id.* at 3.

To guide its determination, "the PSC has adopted a number of regulations to review utility ratemaking and enforce the statutory constraints." [R. 21 at 2.] Foresight filed suit in response to one such regulation. Recently, the PSC adopted 807 KAR 5:056(3)(5), which reads in relevant part:

> For any contracts entered into on or after December 1, 2019, the commission shall, in determining the reasonableness of fuel costs in procurement contracts and fuel procurement practices, evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel less any coal severance tax imposed by any jurisdiction.

2

The Commonwealth of Kentucky imposes a 4.5% severance tax on any coal mined inside its borders. *See* K.R.S. § 143.020. By contrast, Illinois imposes no severance tax on coal producers in Illinois. [R. 4-1 at 14.] According to Foresight, the effect of this regulation is that "[i]f a Kentucky coal producer bids $50 per ton, while an Illinois producer bids $48 per ton . . . the Regulation directs utilities to artificially view the Kentucky' producers' price as $47.75—a 4.5% reduction that accounts for the severance tax[.]" *Id.* at 3. It follows, says Foresight, that the Kentucky producer will win the contract based on the artificially lowered bid. Therefore, Foresight argues the foregoing regulation violates the Commerce Clause of the United States Constitution because "[i]n both its purpose and its effect, the Regulation discriminates against coal produced by Foresight Coal Sales, LLC . . . simply because it was mined [] outside of Kentucky." [R. 4-1 at 4.]

**II**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (finding that issuance of a preliminary injunction "involv[es] the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it")). To issue a preliminary injunction, the Court must consider: 1) whether the movant has shown a strong likelihood of success on the merits; 2) whether the movant will suffer irreparable harm if the injunction is not issued; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing the injunction. *Overstreet,* 305 F.3d at 573 (citations omitted).

3

A court need not consider every factor if it is clear that there is no likelihood of success on the merits. *See Amoco Protection Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). The Court of Appeals clarified that, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012)).

**A**

Standing is a threshold inquiry in every federal case which may not be waived by the parties. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987). "To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (citations omitted). Plaintiffs' injury-in-fact must be both particularized and concrete. *Spokeo v. Robins*, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). Further, a "concrete" injury is a *de facto* injury that actually exists. *Id.* Finally, "a plaintiff must also establish, as a prudential

4

matter, that he or she is the proper proponent of the rights on which the action is based." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1275 (6th Cir. 1988) (citations omitted).

Defendants argue Foresight lacks standing because the challenged regulation does not regulate Foresight's conduct. [R. 21 at 8.] "Nothing in the regulation requires the Plaintiff to do or to refrain from doing anything. Instead, it regulates the PSC's *own* conduct." *Id.* Defendants are apparently arguing that Foresight has not demonstrated an injury-in-fact. According to Defendants, Foresight's perceived harm is speculative, because "the regulation only affects the Plaintiff *if* the regulation causes the PSC to exercise its discretion in a manner that affects the utility companies *and if* the utility companies then change their behavior in a way that injures the Plaintiff." *Id.* (emphasis in original).

"[W]hen a plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). Nevertheless, the Court finds that Foresight has established standing in this case. Foresight has alleged both a constitutional violation and economic harm stemming from the regulation. In response to the PSC's new rule, Foresight has been "forced to account for the 4.5% advantage given to Kentucky bidders" in submitting bids in response to invitations from Kentucky utility companies. [R. 4-1 at 17.]

In *Dominion National Bank v. Olsen*, the Sixth Circuit addressed a Virginian banks' challenge to a Tennessee law which imposed a tax on earnings from certificates of deposit issued by out-of-state banks, but owned by residents of Tennessee. 711 F.2d 108 (6th Cir. 1985). Despite not being directly regulated by the Tennessee statute, the Court found the Virginian banks had standing to bring their dormant Commerce Clause claim. The concurrence explained

5

that "indirect economic harm resulting from governmental action can constitute injury in fact." *Id.* at 113–14 (concurring opinion) (citing *Jet Courier Services, Inc. v. Federal Reserve Bank*, 713 F.2d 1221, 1225 (6th Cir. 1983)).

Defendants also point out that the effects of the regulation are largely unknown. The regulation is recently enacted, and by its text, the regulation applies only to "contracts entered into on or after December 1, 2019." 807 KAR 5:056(3)(5). Therefore, Defendants argue, no one can know for certain how the regulation will operate in practice because "the PSC has not conducted either a six-month or two-year review of utilities' fuel costs" since it was enacted. [R. 21 at 6.] Those reviews will not occur until June 2020 and January 2021, respectively. *Id.* Despite this uncertainty, Foresight is "entitled to litigate whether [the regulation] has had an adverse competitive impact on their business." *Bacchus Imps. v. Dias*, 468 U.S 263, 267 (1984). Accordingly, Foresight has standing to bring this action.

**B**

The Commerce Clause of the United States Constitution endows Congress with the power to "regulate commerce with foreign Nations, and among the several States, and with the Indian tribes[.]" Art. I, § 8, cl. 3. Inherent in this grant of power to Congress is a limitation placed upon the states. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010) (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)). "This self-executing limitation is often referred to as the 'negative' or 'dormant' aspect to the Commerce Clause." *Eastern Ky. Resources v. Fiscal Court*, 127 F.3d 532, 539–40 (6th Cir.

1997) (citing *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995)).

The dormant Commerce Clause prohibits states from enacting statutes or regulations aimed at economic protectionism that are "designed to benefit in-state economic actors by burdening out-of-state actors." *Id.* at 540. The standard for evaluating alleged violations of the dormant Commerce Clause is two-tiered. *Id.* "The first step involves determining whether the statute directly burdens interstate commerce or discriminates against out-of-state interests." *Id.* Recognizing that "what counts as a 'direct' burden on interstate commerce has long been a matter of difficulty for courts," the Sixth Circuit looks to whether a law is "protectionist" in that it allows for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Int'l Dairy Foods*, 662 F.3d at 644; *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 449 (6th Cir. 2009). "A statute can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Eastern Ky. Resources*, 127 F.3d at 540. If, after the first step in the analysis, the statute is found to be protectionist or discriminatory, "it is generally struck down without further inquiry," unless "it advances a legitimate local purpose that cannot be adequately served by reasonably nondiscriminatory alternatives." *Int'l Dairy Foods*, 662 F.3d at 644.

If the challenged law is not discriminatory and "has only indirect effects on interstate commerce and regulates evenhandedly," the Court applies the *Pike* balancing test. *Id.* at 644; *see also Tennessee Scrap*, 556 F.3d at 449. The *Pike* test "upholds a state regulation unless the burden it imposes on interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

**1**

The determinative question at this preliminary stage is "whether the movant has shown a

strong likelihood of success on the merits." *Overstreet,* 305 F.3d at 573. Plaintiffs can demonstrate a strong likelihood of success on their dormant Commerce Clause challenge if they demonstrate the regulation discriminates facially, purposefully, or in practical effect.

a

Plaintiffs argue the regulation discriminates facially "by expressly favoring coal from certain states (*i.e.*, those that, like Kentucky, impose severance taxes)." [R. 26 at 13.] Of course, on its face, the regulation instructs that the PSC will "evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel less *any* coal severance tax imposed by *any jurisdiction*." 807 KAR § 5:056(3)(5) (emphasis added). Therefore, Defendants argue, "the regulation does not facially differentiate between Kentucky and other states." [R. 21 at 11.] Further, if another state were to enact a higher severance tax than Kentucky, then Kentucky could even be disadvantaged relative to that state.

Foresight argues that this does not save the regulation. Foresight cites *New Energy Company v. Limbach* for the proposition that "[a] law facially discriminates against interstate commerce when it 'explicitly deprives certain products of generally available beneficial . . . treatment because they are made in certain other States,' not just when it burdens *all* out-of-state products." [R. 26 at 14 (citing *New Energy Co. v. Limbach*, 486 U.S. 269, 274 (1988)).] In *Limbach*, the Supreme Court addressed an Indiana ethanol producer's challenge to an Ohio law that "award[ed] a tax credit against the Ohio motor vehicle fuel sales tax for each gallon of ethanol sold (as a component of gasohol) by fuel dealers, but only if the ethanol is produced in Ohio or in a State that grants similar tax advantages to ethanol produced in Ohio." Put more simply, the Ohio regulation incentivized fuel dealers to buy Ohio ethanol—to the exclusion of ethanol produced in other states— by promising a tax credit. The tax credit was also available

8

for the purchase of out of state ethanol if the producing state offered similar, reciprocal tax credits for Ohio-produced ethanol. The Court rejected Defendant's argument that "far from discriminating against interstate commerce, [the regulation] is likely to promote it, by encouraging other States to enact similar tax advantages that will spur the interstate sale of ethanol." *Limbach*, 486 U.S. 274. The "reciprocity" element of the regulation did not save its constitutionality, because Ohio could not "use the threat of economic isolation as a weapon to force sister States to enter into even a desirable reciprocity agreement." *Id.* (quoting *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 370 (1976)).

Foresight argues the PSC regulation is "virtually indistinguishable" to the one in *Limbach*, because "it extends favorable treatment to producers from certain states (*i.e.*, those that, like Kentucky, impose severance taxes), and it denies that favorable treatment to producers from all other states." [R. 26 at 15.] Foresight is taking an aerial view of the facts of this case compared to those of *Limbach*. The regulation at issue in *Limbach* explicitly granted a tax credit to ethanol producers in Ohio to the exclusion of ethanol producers in all other states, *unless* that state granted a reciprocal tax credit to Ohio-produced ethanol. The regulation at issue here does neither. Not only is there no tax credit awarded—to anyone—under the PSC regulation, it is also lacking the *quid pro quo* reciprocity element. True, the regulation benefits coal producers operating in states with severance taxes, but its effect is not to coerce sister states into enacting severance taxes. Unlike the Ohio regulation in *Limbach*, which sought to procure a reciprocal tax credit for Ohio-produced ethanol in other states, there is no monetary benefit to Kentucky should other states decide to enact, repeal, or modify their severance taxes. Finally, the PSC applies to "*any* jurisdiction" which imposes a coal severance tax. 807 KAR 5:056(3)(5). The regulation is not discriminatory on its face.

9

**b**

Next, Foresight argues the regulation is purposefully discriminatory. "When a party seeks to present circumstantial evidence of discriminatory purpose pursuant to a dormant Commerce Clause challenge, it is the duty of that party to show the effect of that evidence on the challenged statute." *Eastern Ky. Resources*, 127 F.3d at 543. Here, Foresight relies exclusively on statements made by Charmain Schmitt when a proposed draft of 807 KAR 5:056 was announced for notice and comment. [R. 26 at 13.] Chairman Schmitt stated the regulation's purpose was to "remove a disincentive or to incentivize Kentucky utilities to purchase Kentucky coal." [R. 4-1 at 13.] However, as Defendants point out, this statement "was made . . . about a prior version of the regulation that never took effect and that differs materially from the final version of the regulation." [R. 21 at 13.] When it was first proposed, 807 KAR 5:056 read as follows:

> Beginning three months after the effective date of this regulation, the Commission shall, in determining the reasonableness of fuel costs in procurement contracts and fuel procurement practices, evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel less any tax collected under KRS 143.020.

[R. 21 at 13.]

It is with reference to this proposed language that Chairman Schmitt made his statement. Of course, this version of the regulation was not enacted. The PSC explains that the notice and comment period generated several suggestions that the regulation be revised to exclude all coal severance taxes, not just Kentucky's. *Id.* at 14. Whatever the intent of the initially proposed version of 807 KAR 5:056, it does not automatically follow that the intent was the same following notice and comment and the enaction of a materially different statute. Accordingly, Foresight has not demonstrated the regulation, as enacted, is purposely discriminatory.

c

Finally, Foresight contends the regulation discriminates against out-of-state coal producers in practical effect "by requiring utilities to deduct the amount of severance taxes (but not other taxes or expense coal produces incur) when assessing competitors' bids, favoring producers in the highest severance-tax states." [R. 26 at 13.] "There are two complementary components to a claim that a statute has a discriminatory effect on interstate commerce: the claimant must show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation." *Eastern Ky. Resources*, 127 F.3d at 543.

To Foresight, the relationship is clear: "the Regulation artificially enhances the competitiveness of bids from producers in states, like Kentucky, that impose severance taxes." [R. 26 at 21.] Producers like Foresight in states that do not impose severance taxes must lower their bids in order to remain competitive with the producers whose bids have been artificially lowered though the exclusion of severance tax from consideration. But as Defendants point out, "the amended regulation does not apply directly to the Plaintiff. Nor does it apply directly to utilities." [R21 at 17.] Instead, it governs the PSC's conduct during the six-month and two-year reviews of utilities fuel procurement practices, which have yet to occur since the enactment of 807 KAR 5:056. *Id.*

Furthermore, Defendant's disagree with Foresight's straightforward explanation of the PSC's reasonableness assessment. Far from being dependent upon price alone, Defendants argue the PSC's reasonableness review "is a very complex and technical analysis by the PSC." [R. 21 at 19.] The PSC also considers "the quantity sought, term of the contract, quality of the coal (sulfur content, ash, Btu) and transportation." [R. 21-1 at 50.]

Ultimately, it is difficult to ascertain discriminatory effect when the regulation has not

11

been allowed to operate.  There is not sufficient evidence in the record, nor anywhere it seems, to show that coal producers in states that do not impose a severance tax, or which impose a severance tax at a lower rate than Kentucky, are disadvantaged by this regulation.  Foresight has not shown that the artificially lowest bid always wins.  And while it is true that Foresight need not actually lose a bid to demonstrate a constitutional injury—i.e., the loss of Foresight's ability to compete on equal footing— demonstrating the constitutional violation requires demonstrating that the regulation is discriminatory *in effect*.  At this juncture, the Court finds Foresight has failed to carry its burden on this point.

**C**

Based on the foregoing, the Court finds Plaintiffs have not established a strong likelihood of success on the merits.  Absent this showing, the remaining preliminary injunction factors do not warrant the imposition of an injunction in this case.  Constitutional injuries are irreparable, and the public interest is almost always served by preventing a likely constitutional violation.  However, as explained above, the Court requires further development of the factual record in order to determine constitutionality.  Absent that, it is not clear that Foresight's alleged injury is irreparable, and there is no reason to think enjoining a state agency from conducting their regular business serves the public interest.  Finally, issuance of the injunction would hinder the development of the factual record, which is crucial to the Court's ability to assess a discriminatory effect.  Therefore, a preliminary injunction is not appropriate here.

**III**

A motion for preliminary injunction asks the Court to take a preliminary review of the merits of a case.  Through no fault of either party, the record is not fully developed enough for the Court to determine whether the PSC's regulation has caused a discriminatory effect against

12

coal producers outside of Kentucky. Accordingly, the Plaintiff's Motion for Preliminary Injunction **[R. 4]** is **DENIED**.

This the 15th day of May, 2020.

Gregory F. Van Tatenhove
United States District Judge

13